17-0351, O'Neal v. The American Coal Company Yes, Your Honor. Are you ready to proceed? May it please the Court. My name is Daryl Dunham. I am representing the plaintiff appellant. I don't think there's going to be any dispute as to many of the facts of the case. My client worked for American Coal Company. I don't think there's even going to be any dispute that he filed a workers' compensation claim. And then while he was still alive, he was terminated by American Coal. Subsequent to the filing of the lawsuit, he died. We do not allege that his death was associated with any of the injuries that he sustained at work. So his widow and special representative substituted in as the plaintiff in the case, and her name is Susan O'Neal. The defendant, Appellant American Coal, filed most presumptory judgment alleging in a single affidavit, the affidavit of a human resources employee by the name of Cindy Beggs, that my client violated their absenteeism policy. The trial judge reviewed the matter, and in a single docket entry, what was devoid of any reasoning, granted the motion for summary judgment. And we claim, of course, that the termination was causally related to the fact that he filed a workers' compensation claim. Now, I want to speak just briefly about their absenteeism policy. The way their absenteeism policy works is that if you have an occurrence, if you have... Well, obviously, I'm going to talk about it. There is a booklet, Your Honor. It was testified. It was examined at length in Cindy Beggs' deposition. I don't recall whether or not it's part of the record. I think as to the actual, what the policy means and how it's interpreted, at least, I don't think there's going to be any dispute about it. Okay. Then you can go ahead and tell me what your take is on it. Well, if you have three, if you have a total of seven occurrences, the way the policy is worded, American colon, in the facts and circumstances, if you have seven occurrences, you can be terminated. And the occurrences can be or are anything other than work injury related? Is that what I understand? So if you're actually sick for all those seven days or in the hospital, would that be also considered a non-excusable occurrence? Yes, Your Honor. But I think it's also true that if your recurrence is work related, in other words, you're seeing a doctor for work related injuries. Cindy Beggs admitted it in her deposition. It is also in the... Yeah, I picked that up. And the other question I have that I wasn't real clear about, they talk about some of them being partial occurrences. Is that like half a day or something? I don't think that was testified to, as I recall. But, for example, if you miss three days in a row, for example, that will be a single occurrence as long as they're contiguous. I see. That's what I didn't understand. So you could have an occurrence for missing one day. It would still be a single occurrence for missing three days. I see. I get it. And if you look in our brief at page three and four of the brief, the actual occurrences are listed, and that's backed up by there was a document in the record which was attached to or part of the last chance agreement, which I'm going to get into in a moment, where the occurrences themselves are listed. And you can see at C139 of the record or page three and four of the brief, you can see the occurrences are listed, and I indicate in my brief what I consider to be an occurrence. Now, I should say there's a difference of interpretation between the plaintiff and the defendant as to whether an occurrence in early March of 2012 should be part of the listed occurrences or not. I don't think it makes any difference because we contend, we believe that the record indicates that at least three of the occurrences were work-related. And what I want to get into just briefly is we see in the cases a lot of statements that are made, and the respondent probably properly picks up on them and says, well, if you violate an absenteeism policy, you can be fired. And I think that is an accurate statement of the law. But under the Heartline case, Illinois Supreme Court case, can also indicate that if the operative reason for the termination is a pretext, in other words, it's a misapplication of the policy or the policy itself was implemented for a protectual reason, then that doesn't defeat the claim, and a jury should decide the merits of the case. And what we contend is we're not contending at this point, although we did initially in the case, that the entire policy is protectual, we believe, we contend that the record shows that the application of the policy in this case was a pretext. So the coal company claims that the wife, I forget her name, Susan. Susan. Her affidavit should not be considered, partly because she is the wife, apparently. And partly because the, I guess, the attached medical records were not authenticated. That was a position they took. And what do you say to that? Well, you're on the only reason we got the counter affidavit in, and that's kind of second on my talking points in here. That affidavit is properly admissible. If we had a trial in the case, what Susan O'Neill would testify is to, she was very devoted to her husband, and when he went to see medical treatment, even over as far as Evansville, she went with him every time. And she was there. And although the medical records are not, you know, properly authenticated and the like, they were used to refresh her recollection as to the actual date of the exhibits. So you weren't attempting to submit those as authentic medical records? No, Your Honor. What they were used to endorse, to substantiate, is that on certain dates that are set forth in the attachment to the last chance agreement, she was there, she knew why he was there, and she even asked the medical providers to fax to American Coal and document the visit in her affidavit. She also indicated that for two of the three visits, her husband, John O'Neill, was sent to Dr. Alexander in Harrisburg, Illinois, by American Coal. He's the company doctor. And so the only other one is August 1st of 2011, and we have the medical records indicating that he went to Evansville on that particular date. So if we knock out all three of those visits, we're below the seven minimum for them to terminate him. In other words, it's our contention that the original last chance agreement was a fraud. The other reason for believing that, Your Honors, is that in Cindy Begg's deposition, the only witness that we took her deposition in this particular case. Is she resource management? Yes, she is. And she's the one that is primarily responsible for tracking the absences. But what she did say in her deposition, and I think it's very important because it was going back and looking at the brief, I think it's going to be essential for the court to actually read the deposition really in total to get an understanding of what was going on there. But they had an insurance workers' compensation employee by the name of Anita Day. And she indicated, and Cindy Begg testified in her deposition, that the burden of proving that this was a work-related visit to the doctor wasn't always on the employee. That was Anita Day's job. Anita Day was regularly in contact with the insurance company, Rockwood, and there was a double-checking procedure that was in place to make sure that before they listed a particular visit, a particular no-call, no-show as an actual occurrence under the policy, they checked to make sure that this wasn't a workers' compensation-related visit. Well, something certainly happened here. Because we've got my client, Susan O'Neill, indicating that it was a workers' compensation visit as to August 1, 2011, and two of the visits was to the company doctor sent by American Coal, putting them below the threshold of the seven visits. Now, I think probably a more salient point, because it doesn't require Susan O'Neill's affidavit in this case in order to prevail and have the matter sent back so the jury can decide these facts rather than the judge, and that is we contend, we believe, we assert there wasn't any violation of the last-chance agreement. In the letter terminating my client's deceased husband, they mention a no-call, no-show March 21st, March 22nd, 2012, and say, well, under the last-chance agreement, assuming it was valid in the first place, one occurrence, you're terminated. That's the only evidence that he didn't report to work is that letter itself. And if you look at Sidney Begg's deposition, what you're going to see is they have a pretty elaborate procedure at American Coal. An employee doesn't show, that's indicated on the timesheets. Whoever is there at the office where the employee is no-call, no-show, that's documented, and then that information is given to another employee that inputs it on the computer, and then that information is given to Sidney Beggs, and she lists it as no-call, no-show, assuming that she's gotten the appropriate input from a needed day at the time, saying it's not a workers' compensation-related visit. And so in her deposition, I took all of the documents that have been produced thus in discovery, and I said, give me the documentation showing that on March 21st, March 22nd, that my client was no-call, no-show. And she said, well, it wasn't there. And then I said, well, do you have it documented somewhere? Would it be in your computer logs? Wouldn't you have evidence of it? And she said, well, yes, we would. And then I asked her in her deposition, well, when you sent out, when you had this termination letter sent out, did you actually check those lies? She said she didn't recall. I said, well, yours is the only affidavit in this case. What records did you review before you signed the affidavit? She said she didn't recall. But what she did say was American Coal would have evidence of those documents in its computer system. So here's the scenario. Number one, I indicate in my brief under Rule 214, particularly even though it's electronically stored, they've got a duty to supplement their answers to the requests produced. They didn't do it. So they filed for motion for summary judgment. I filed the counter-affidavit, and I indicate we're contesting. In their brief they say we didn't raise this argument on appeal, but we did. We raised it below, and we show where we raised it below in her affidavit. And so they had plenty of opportunity to go through their computer records and produce the supporting information on which she concluded. She had to have looked at something to conclude that on March 21st, March 22nd, my client was no call, no show, if in fact he was no call, no show. And we don't believe he was no call, no show at all. We think this was manufactured on their part, which obviously makes it a pretext. So are you saying that he was at work, or he could have been at a doctor's visit that was not considered an occurrence? What we know for sure is, and it's not in the record, I have to confess to that, it's not in the record, but we do not believe he was at the doctor on that particular day. And my client did keep, Susan O'Neill did keep a record of doctor's visits, and there's no record of a doctor's visit. She did not keep a record of every day that he went to work. And so we're saying prove it. This is motion for summary judgment. Prove it. They can't prove it. What we contend, and this is what we're going to argue to the jury if you let us do that, we're going to just say this is manufactured, because that's in fact what we believe it is. Because given the opportunity, my client is going to testify that my client, John O'Neill, he loved to work. He wasn't one of those people who would work with begrudging. He knew he was under a lost chance agreement. He had to attend work. So we don't need to get there if, in fact, we determine that the last chance agreement was based on an invalid number of occurrences. That's what we believe. Only one occurrence for violation of the last chance. Oh, well, yeah, we don't need to get there also if the last chance agreement was based on fraudulent data in the first place. So never mind, I'll ask the question I was thinking. Go ahead. Okay. But I do thank you for your questions, and I appreciate them very much because they show, they really get to the crux of the matter here. We believe that if this case were tried on our second theory that there was no violation of last chance agreement, we'd be entitled to the jury instruction IPI 5.01, missing evidence. And you go through the analysis, was the evidence, and what I'm talking about is this digital record which would show whether my client, there was documentation showing that he didn't report to work. There was no timesheet for him on March 21st, March 22nd. Well, I presume that if you had the opportunity to go to trial, and the coal company would have the opportunity to rectify that, correct? Well, that would, I guess, be up to either this court or the trial judge. If that would be an equitable disposition of the matter, I suppose we could do that. But the coal company had ample opportunity to produce that evidence that Cindy Biggs said was there. Have you filed any motion for sanctions related to discovery of these? The motion for summary judgment was granted, and I think the best that I can do at this point is point out that deficiency in this court. My point is, under IPI, the documentation, the digital documentation, was in control of American Coal. They had a duty to supplement. They not only had a duty, but I'm saying the jury instruction, and this was pointed out to the trial judge in oral argument, under the jury instruction, the jury could make the inference that the documentation doesn't exist, and the jury could make the inference that if the documentation does exist, for example, he actually appeared at work and he did have a timesheet, that the documentation would be adverse to American Coal. But don't you have to file some motion to bring that an issue? I mean, at this point, she honestly said, apparently honestly said, I don't have that documentation with me, but it is available, this Cindy Biggs. So it's not like they were trying to cover it up. I'm trying to remember the time period, whether we had sufficient time to do that. What we did do, Your Honors, is we did raise this. Well, I understand, but I think it sounds somewhat premature, depending on how we rule as to whether or not the court would even consider a sanction of what you're arranging. At this point, Your Honor, I'm not asking for sanctions. I didn't file a cross-examination. Well, you're asking for a jury instruction, basically. What I'm asking for is a ruling from this court saying that summary judgment was inappropriately granted, send it back for trial, and let the jury decide. I don't even know that I'm going to ask for the document at this point because I'm entitled to a jury instruction. Well, now you're determining what the trial court will do. Well. You might not want a second guess, I guess. Well, if the trial court doesn't think I'm entitled to a jury instruction, or IPI 5.01, when I've looked at the jury instruction and it's set out in my brief and every one of the elements is met, one, the evidence was under the control of the party and could have been produced by the exercise of reasonable diligence. He testified in deposition that they had it. They kept it. It was in the digital record. The evidence was not equally available to the adverse party. We had no way that we could get this. I understand it, but you're not at the point where you're in trial. Generally, if someone does not supplement, there is a motion to compel and then a motion for sanction. Our contemporaries. You know, you're convincing me, Your Honor. I guess I'll take it up with me if it comes up. Thank you. It's lovely here. Please record, Mr. Dunham. My name is Bill Schmidt, and I represent the defendant, Applee, in this case. There's a number of things I want to address, and first I would like to address some of the questions that Judge Chapman raised. First of all, there was one month from the time of Cindy Biggs' deposition to the court's order of summary judgment. During that time, Plaintiff never requested this so-called computer data. But he does say that you have a continuing duty under the Supreme Court rules to supplement. The request for production and the response to the request for production was never an issue at the summary judgment stage. There was never a motion for sanctions filed. There was never a motion to compel filed. And actually, I have to speak a little bit from memory here because this was not part of the dispute. But I've had any number of cases, retaliatory discharge cases, with Mr. Dunham. I'm familiar with the standard request for production, and I'm familiar with American Coal Company's standard response. He has a standard request for production that basically asks for every single document on which his client's names appear. We object to the overbreadth of that question, and we produce such available records as the entire personnel file, which includes the occurrence detail report, as well as the last chance agreement, as well as the termination letter, and everything else that's in his personnel file. The information that goes into the computer, usually entered by some other employee in the mind control room, that takes calls, hey, I can't come in today, I've got to have a doctor's visit, or the employee himself or herself telling mind control, hey, I'm not going to be in tomorrow because I have a doctor's appointment. In any event, that information is inputted into the computer and is used to periodically prepare these absence and occurrence reports, which details the unexcused absence. This becomes the employee's permanent record, the coal company's permanent record, and that's what's placed in his file. Go ahead. Are you suggesting that the underlying documents that subsequently end up in the computer, those were produced? They were not produced. Those were not produced. No, we make an objection to the overbreadth of the request. We produced those things, and plaintiff never filed a motion to compel or brought that objection up for argument. And at Sidney Bigg's deposition, when he was asking about this computer data, he said, this is two weeks before the hearing on the motion for summary judgment and a month before the ruling, if I ask for this stuff, can you get it to me, if I ask for it? And plaintiff never asked for it. You know, Mr. Schmidt, I think, and I appreciate your answer, but I think we're getting, I think we've got the cart before the horse, though, because we're a long ways from whether or not there even needs to be jury instructions, you know, with respect to that. You know, I agree with you 100 percent. This is an objection to the two parts. My central question to you right now is, plaintiff has alleged that two of the occurrences before the last chance letter were to a company doctor, Dr. Alexander. I mean, is that in the record anywhere? No, it is not. But I'm not going to say it wasn't the company doctor. He certainly conducted examinations for the American Coal Company, but he also saw American Coal employees as private patients. And I don't know, and Mr. Dunlap can point it out, whether it is in the record that he was, that the deceit was specifically sent to Dr. Alexander. So there is a dispute whether or not, I guess there's probably not a dispute that he was the doctor. Well, I'm going to get to that. Frankly, I'm going to argue to you, Your Honors, that it doesn't make any difference. And tell me why. So let's cut to the chase. First of all, there were a total, Mr. Dunlap has correctly described the absenteeism policy, although it applies to excused absences other than work-related injuries. But he has otherwise accurately described it. So let me understand what you just said. So if he got ill and even had a doctor's excuse that was unrelated to work, that would also be an occurrence? Yes, ma'am. Okay. All right? All right. So if we look at this, and we can use Plaintiff's brief, because there was actually ten occurrences, seven of which were sufficient to justify termination. Plaintiff's opposition to the motion for assembly judgment does not address the last two absences, the ones that occurred right after the last chance agreement on March 20 and 21, although he brings them up on this appeal and I want to talk about it. But when he files the response to motion for assembly judgment two days before the hearing, even though it was our position, that's when we first saw that they were relying on medical records, which Plaintiff concedes were not authenticated and were used solely for the purpose of refreshing Mrs. O'Neill's memory. So they're not authenticated. The law is very clear that they must be authenticated. I think it's very clear that they must be authenticated if they're offered for authentication of the records. I maybe don't agree with you with respect to the fact that she did file an affidavit swearing that she was with her husband and they were for work-related injuries. But you see, Plaintiff's argument assumes that those documents, that record of the doctor's visit was furnished to American coal. There's absolutely no evidence of that. Well, now you're going to another issue. That's not what she's saying is that I was with him and these were work-related visits. And the point I'm trying to make is that that is insufficient to create a genuine issue of material facts. Why would that be insufficient to create a genuine issue? The whole issue is whether or not it's pretextual and whether or not he has met this minimum. This comes in years after the fact, years after the gentleman was terminated, based upon legitimate documentation that he had sufficient unexcused absences. All her affidavit does is- Is raise the question whether or not they were legitimate unexcused absences. But that he would have had to have had that before he was terminated. I mean, he's dead for years, quite frankly, when this information is first presented to the court in opposition to the motion for summary judgment. I'm aware of that. Yeah, so. In any event, what we did- There's really only two comments I want to make here. Plaintiff argues that these March 20 and 21, 2012 absences, which occurred after the last chance agreement and which resulted in his termination, should not have been considered. And in fact- Well, now you're talking again about the ones that you said were- I am. Were a tempest in a teapot. Let's talk about the three that he contends were work-related injuries. Okay, I can do that. After we got the response to motion for summary judgment, even though we felt that the evidence was clearly inadmissible, we did drill down, and I'm going to drill down a little bit here, and I'll just take one of those visits. And that's the visit for February 13, 2012. Is this going to be on the record? Yes.  Because we hadn't seen that one before, all right? And it describes a new and different incident. It describes a new and different injury to an entirely different body part. He was actually complaining that his chest hurt when he coughed because he had bronchitis. American Call had no such report of an accident or an injury. But now you're getting into medical evidence or testimony that- Because that visit was on February the 13th, February the 14th. He actually missed the next two consecutive days on the 14th and 15th. Therefore, even if he would deem it admissible and gave the plaintiff every benefit of the doubt and streamed the evidence most favorably to the plaintiff, he still had an unexcused absence. He missed two other days, which together constituted one occurrence. And so even disregarding the other two visits, he still had seven occurrences prior to the execution of the last chance agreement. I still have trouble with this occurrence definition. You're saying that he missed a total of three days, which is one occurrence. He missed three days, one of which plaintiff contested with a medical record. Because he was at the doctor. So even giving him that benefit, he still had two additional consecutive days missed. And so it still constituted an occurrence. But now you're trying a case. Because how- I mean, that obviously hasn't been determined in any way. There's been no deposition taken at the doctor. There's been no testimony that has been raised. And a lot of it was verified evidence to that effect by Cindy Biggs in her affidavit and in her deposition testimony. It's that type of verified evidence that can and should be used as a basis for a motion for summary judgment. And so there were still seven occurrences, even looking at things most favorably to the plaintiff and even assuming inadmissible evidence should have been considered by Judge Lambert. There were seven occurrences that justified his termination. The company decided, elected not to terminate him at that point in time, but instead gave him an option. Either be terminated or sign a last chance agreement. He elected, and understandably so, to sign the last chance agreement. And the very next week he missed two more days without excuse, which prompted him to be terminated. And that March 20 and 21 absences, as Cindy Biggs testified, contrary to plaintiff's assertions, she says that the termination letter constitutes the documentation of those absences. And even plaintiff says here today that plaintiff cannot say that he worked on those days. And in fact, so far to say is that there's no record that he attended a medical provider on those days. They were clearly unexcused. I think that's been conceded, basically. I'm sorry? It seems to me that that second point has been conceded. It seems to me. So now we've got more than sufficient unexcused absence to justify termination. We have a clear and undisputed and uncontradicted absence following the last chance agreement, which justified his termination. And there was no issues of fact. There was no contradictory evidence to create a genuine issue of material fact on those points. Well, I thought that you argued in the brief that the court should not have considered her affidavit at all. Therefore, we never had a shift of burden. No, ma'am. We did not argue that it wasn't considered. In fact, it was plaintiff argued in his brief, in her brief, that the trial court did not consider it, that the trial court ignored it. I am prepared to assume, as I think we should more properly assume, that the trial judge considered all evidence that was presented to him at the trial court level. That's the more logical presumption. Your arguments, though, go to the essence of your arguments on the affidavit is that they should not be considered. Number one, since she should not have been allowed as a witness with respect to his injuries or anything to do with the comp matter. And secondly, that there was no authentication of the medical record. Those are all my arguments, and they're my arguments here. But maybe the trial judge disregarded my arguments and considered Mrs. O'Neill's affidavit and the supporting documents for what they were. But for a plaintiff to say that the trial judge refused to consider a plaintiff's response, including Mrs. O'Neill, there's absolutely no basis in the record that Judge Lambert did that. And the judgment is sustainable on anything in the record, and the arguments we made, between you and me, Judge, I suspect that the court didn't buy my argument that she had not been disclosed as a fact witness. But I think there was substantial legal authority and argument that these medical records constituted inadmissible hearsay and could not be considered on the motion for assembly judgment because only admissible evidence may be used to, used by the non-moving party to create a genuine issue of material fact. The plaintiff has conceded that it was not admissible. It would not have been admissible at trial as the actual medical record. It was not authenticated. Let's take the medical record out of the equation. Do you think then that the court could consider her affidavit, that I did attend his medical visits, and these were medical visits that were related? He surely could. Secondly, because she added the undocumented medical records, then the court could not consider it. No, I'm prepared to say that even without regard to the medical records, the trial judge certainly could have considered those other statements that you just took from her affidavit. The point is it didn't create a genuine issue of material fact. All she had in her affidavit is that she would accompany her husband to medical visits, and the two of them together would say, please fax your medical records to the coal company. There's no indication that that was ever done. The medical records produced do not contain any faxing information. But there was something in the affidavit that I recall, and I may be wrong, that said that he was sent to, on two of those occasions, that he was sent to the company doctor by the coal company, I presume. That would be Dr. Alexander. I don't want to misstate anything here. I'm not sure that I'm correct in stating it exactly that way. It does say that. But how is that admissible, Your Honor? How can she testify without... Doesn't it raise an issue of material fact? Any admissible evidence cannot create an issue of fact. She says that her husband was sent to Dr. Alexander by the defendant. How would she know that in order to competently testify to it? If that was true, then it was the company telling Mr. O'Neill to go see Dr. Alexander. So Dr. Alexander is the company doctor. He is a company doctor in the sense that he performs examinations on behalf of the company. But that's not his sole practice. And, in fact, he sees employees of the company as private patients. So is there any admissible evidence that the company sent Mr. O'Neill to Dr. Alexander on those two visits? And I respectfully submit there is none. Would it be an issue as to whether or not they, in fact, did send him to Dr. Alexander or he saw him for his own purpose or own personal illness? Well, it would be important if prior to the last chance agreement or, more importantly, prior to the termination, that that documentation was furnished to the company so that they would not have been listed as unexcused absences. That never happened. In fact, that evidence first appears five years later. Well, she does say that she asked them, and when she went to the doctor, she asked them to forward that medical record. Now, doesn't that raise an issue as to whether or not they, in fact, did? And whether or not the company, in fact, did receive that? I respectfully disagree because there's no evidence that the medical providers did it. Well, that's, I guess, the issue I'm saying that is still disputed. Well, if they didn't, that means those absences were justifiably listed as unexcused. But if they did, then that could be proven or shown. But the question is, at the time of plaintiff's termination, did the company act intentionally with an illegal retaliatory motive? Well, under these arguments, if there's any illegal retaliatory motive being suggested by this, it happens five years after he was terminated. I understand that. Okay. I appreciate the Court giving me this time. I'll make this final comment because I think the case is best summed up with plaintiff's own conclusion in the appellant's brief, where it is argued that defendant did not follow its own procedure or its policy when it had the decedent sign the last chance agreement, actually forced him to sign the last chance agreement. Well, of course, there's no evidence that defendant forced or required decedent to sign that last chance agreement and no evidence that it did not follow its policy. And the second point in the conclusion that there was no evidence that decedent violated the last chance agreement, but as has been demonstrated not only in the arguments but here today, the evidence was clear, it was undisputed, and it was without contradiction that after execution of the last chance agreement, he missed two more days to be excused in the very next week after he signed it. So that summary judgment was appropriate, and we ask the Court to affirm Judge Lambert's judgment order. Thank you. Thank you. My time is brief. At page C134 of the record, in the response to the motion for summary judgment, the plaintiff makes the following statement to the trial court. A jury should also be permitted to conclude the defendant's claim that on March 20th and 21st that O'Neill had an occurrence as false. At her deposition, Biggs was not able to produce supporting documentation, and I attach her deposition in full in response to the motion for summary judgment. One of the points that I think has maybe been missed is that American Coal assumed its own responsibility for verifying these visits. This is the question that was put to Cindy Biggs, page C168 of the record. Did American Coal require the employee to document the fact that the absence was due to a work-related injury? The answer, yes. But she goes on to say, but the burden wasn't always on the employee. We had a workers' compensation manager, and she could track down the information and verify that for them. And then later on in the deposition, she testified that routinely, her name was Anita Day, that this lady did that. You know, he argues about the last chance agreement and the occurrence. He admits that O'Neill went and saw Dr. Alexander on May 13th, not May 13th, February 13th, and he was also absent on the 14th and the 15th. If you look at the last chance agreement and the attachment C-137 of the record, you will see that even American Coal treated the 12th, the 13th, and the 14th as one and only one occurrence and not three separate occurrences. You know, it's interesting that counsel says, well, these documents were, the medical records were not authenticated. But certainly they can be used to refresh my client's recollection as the purpose of the visit and why her husband went there. But in Cindy Biggs' deposition, she makes clear that if those very records had been faxed to American Coal unauthenticated, it would not have been treated as an occurrence. So he can't say, he's arguing, well, we didn't have notice, we didn't have notice. Well, by his own argument, his own interpretation of the policy, unauthenticated medical records faxed to American Coal can be a justification, was routinely used as a justification as not a no-call, no-show, was not an occurrence. I don't think that the trial judge could have entered the judgment he did. The only way he could get there was by ignoring my client's affidavit. At page 6C137 of the record, here's what she states to the trial court. My husband, John O'Neill, was injured at work on June 16, 2011. After his injury, I attended each of his doctor's appointments that was related to his injury until the time of his death. And then she goes on and she identifies the visit to Dr. Graham on August 1, 2011, and the visit to Dr. Alexander on February 13, 2012, and an additional visit. No matter how you count, we get down to six. No further questions. Thank you, Your Honor. Thank you. Court take matter into consideration. I want you to roll on your time.